Judgment rendered November 19, 2025.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 56,407-CA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

KAREN TEMPLE                                    Plaintiff-Appellant

versus

RICHARD BALLARD, M.D., ET              Defendants-Appellees
AL

* * * * *

Appealed from the
Third Judicial District Court for the
Parish of Lincoln, Louisiana
Trial Court No. 62,076

Honorable Thomas W. Rogers, Judge

* * * * *

PARKER ALEXANDER, LLC                   Counsel for Appellant
By:  Kevin D. Alexander
      Chad C. Carter

HUDSON POTTS & BERNSTEIN, LLP       Counsel for Appellees,
By:  Gordon L. James                          Richard Ballard, M.D.
      Donald H. Zeigler, III                    and LAMMICO
      Sara G. White

* * * * *

Before COX, THOMPSON, and MARCOTTE, JJ.

**THOMPSON, J.**

A patient experienced significant complications following knee replacement surgery, undergoing nine separate procedures over three years to address infection and other problems.  The patient eventually sought a second opinion, learned she was close to losing her leg, and received treatment from a new orthopedist in Baton Rouge, Louisiana.  She briefly battled infection after her latest surgery there, eventually recovered, but still suffers from pain in that knee.  A medical review panel found her original doctor fell below the standard of care in his treatment, and the patient filed suit.  A jury trial was held and various doctors testified regarding the standard of care for when a doctor should refer a patient to another doctor when suffering continuing complications.  The jury returned a verdict finding that the doctor did not fall below the standard of care, and the patient now appeals.  Finding the jury was not manifestly erroneous in reaching its conclusion, we affirm the jury's verdict.

## FACTS AND PROCEDURAL HISTORY

Karen Temple ("Temple") was referred to Dr. Richard Ballard ("Dr. Ballard") in 2015 for evaluation of osteoarthritis in both knees.  Dr. Ballard performed a total knee replacement on Temple's right knee with no documented problems or complications.  Approximately three months later, Dr. Ballard replaced Temple's left knee, the recovery from which was not without problems and complications.  Over a three-year period Dr. Ballard performed the following procedures on Temple's left knee prior to her filing of this lawsuit:

1. The initial left knee replacement happened on September 23, 2015.  After this surgery, Temple had wound discoloration, drainage, and

swelling. Dr. Ballard placed her on oral antibiotics and local wound care.

2. On March 23, 2016, Dr. Ballard performed a debridement and wash out of the knee. As of May 23, 2016, the wound had not healed, and Temple still experienced pain. Records from June 13, 2016 reflect an increase in left knee pain and swelling. After an x-ray revealed possible loosening of the patella component, Temple was diagnosed with synovitis (swelling of the knee joint), and she was placed on oral antibiotics.

3. On July 1, 2016, Dr. Ballard performed a left knee arthroscopy with irrigation of the knee joint after a post-operative diagnosis of sepsis of the knee.

4. On November 11, 2016, Dr. Ballard performed a surgical exploration of the knee, after he suspected quadriceps insufficiency, when Temple felt a pop in her knee while trying to stand.

5. After a bone scan and signs of infection, on February 24, 2017, Dr. Ballard performed a left knee component removal procedure.

6. On May 12, 2017, Dr. Ballard performed left knee revision surgery with component replacement.

7. On October 13, 2017, Dr. Ballard performed a closed knee manipulation and reduction after Temple's knee failed and she fell, with x-rays revealing a dislocation of the knee.

8. On April 18, 2018, Dr. Ballard performed a total knee revision surgery, after a fall dislocated her knee.

9. On September 26, 2018, Dr. Ballard performed another total knee revision surgery, after imaging in June, July, and August showed the knee prosthesis was completely dislocated.

On November 15, 2018, Temple had another left knee dislocation and returned to Dr. Ballard, who recommend another revision surgery.

Frustrated with the complications and persistent need for treatment under Dr. Ballard, Temple elected to see another doctor and went to see Dr. Myron Bailey at University-Health Monroe, who then referred her to his brother, Dr. Sydney Bailey. Dr. Sydney Bailey recommended she see Dr. Neils

2

Linschoten in Baton Rouge, Louisiana, who frequently accepts orthopedic patients with complicated outcomes.  On January 14, 2019, Dr. Linschoten performed a knee reconstruction with a rotating hinge and later performed two "irrigation" procedures with application of antibiotic beads.  Dr. Linchosten told Temple that by the time she came to see him, she was in danger of losing her leg.

After Temple instituted an action for medical malpractice, the medical review panel unanimously found that Dr. Ballard failed to comply with the appropriate standard of medical care as charged in the medical malpractice complaint, and that this conduct was a factor in the resultant damages sustained by Temple.  Temple then filed suit, and a trial was eventually held.  Several doctors testified at trial regarding the care provided by Dr. Ballard, the outcomes, and opined on the issue of at what point with the results and complications experience by Temple would he have been required to recommend a second opinion.  The testimony at trial is described below.

Karen Temple testified that she had osteoarthritis in her knees, and she was bone on bone for both of her knees starting in 2007.  She was referred to Dr. Ballard by her primary care physician and had surgery on her right knee first on June 17, 2015, with a good recovery.  Dr. Ballard did surgery on her left knee on September 23, 2015.  She testified that her left knee got infected, and when it was better, Dr. Ballard performed another surgery on her.  She testified that her knee got infected after the second surgery as well and required a third surgery.  The knee got infected and dislocated again after the third surgery.  She had a fourth surgery, and her knee continued to be dislocated and infected.  Fifth and sixth surgeries were

3

performed, with little success. Temple testified that the weakness in her knee caused her to fall multiple times. Seventh and then eighth surgeries were performed and were not successful. Temple had a ninth surgery and was still having pain. She testified that Dr. Ballard told her after the eighth or ninth surgery that she could go see another orthopedic surgeon.

After the ninth surgery, Temple went to see Dr. Myron Bailey, and then to Dr. Sydney Bailey, who sent her to Dr. Linschoten in Baton Rouge, Louisiana. Temple testified that Dr. Linschoten told her that her knee was in bad shape and she was about to lose her leg. Dr. Linschoten performed surgery to fix her knee and then she underwent two additional procedures to again address infection. She remained hospitalized for three months while the infection healed. The infection was resolved by the time of trial, but she testified that the knee hurts all the time. She must walk on a walker and still has pain. She is unable to care for her home the way that she used to do and cannot walk in the woods. She cannot dance or exercise. On cross-examination, Temple testified that she went on disability in 2009 because of osteoarthritis in her knees and back. She testified that Dr. Ballard had given her his cell phone number in case she needed anything. She stated that she had had hernia surgery on December 4, 2017, and she had an infection with the mesh of the hernia.

Temple's husband, Jamie Temple, testified about the emotional shock his wife suffered when she found out she might lose her leg. He testified that he performs some of the household chores his wife used to do and that her pain has impacted their marital life.

4

Prior to their testimony at trial, the expert medical witnesses and members of the medical review panel were provided with a copy of the expert report prepared by Dr. Douglas Brown, Temple's expert witness. The medical review panel was composed of Dr. David Googe, Dr. John Noble, and Dr. Timothy Randell. Dr. Noble and Dr. Googe both testified at trial.

Dr. David Googe, an orthopedist, testified that he believed Dr. Ballard's treatment was outside of the standard of care. He testified that Dr. Ballard should have referred Temple to another orthopedic surgeon by the time he performed the third surgery. He testified that the panel had a problem with the number of procedures that Temple had without seeking additional advice and that having a second opinion would have been best practice. He testified there is no specific guideline on when Dr. Ballard should have referred Temple to another doctor. He testified that in his line of work, generally three operations would be the outside number of surgeries before referring a patient to another doctor but noted that this rule is not hard and fast.

Dr. Googe further testified that seven or more surgeries is out of bounds, excessive, and below the standard of care. He disagreed with the assertions in the report by Dr. Ballard's expert witness that an open wound can be a normal part of the knee replacement process. Dr. Googe testified that he believed there was a consensus that there should not be a tenth surgery without seeking another opinion. When presented with the testimony that Temple elected to wait to see another orthopedist, Dr. Googe testified that Dr. Ballard is the expert in that situation and should have referred her to another doctor.

Dr. John Noble testified that he is an orthopedic surgeon and was also a member of the medical review panel that reviewed Temple's case. He confirmed that the panel found that Dr. Ballard failed to meet the standard of care and there was no disagreement among the panel members. The panel also found that Dr. Ballard caused Temple damages. He read Dr. Brown's report and nothing in it changed his opinion. He was unaware that Dr. Ballard offered Temple the opportunity to go to another orthopedist, and Dr. Noble testified that *if* Dr. Ballard offered for Temple to be treated by another physician, then he satisfied the burden of care.

Dr. Linschoten testified that he treated Temple's left knee after she had been seen by Dr. Ballard. He described his treatment of her knee as a salvage procedure, meaning a last resort procedure to save the leg. He said this was a condition that he rarely sees in his practice. He noted that Temple was treated with mesh for her hernia, which can harbor infection that can spread to the knee. If he had known that she had a mesh infection prior to seeing him, he would have kept her on antibiotics longer.

Dr. Ballard testified and described his treatment of Temple. He reviewed Temple's medical records for the jury, explaining his treatment of her knee. Dr. Ballard could not recall when he suggested that Temple may want a second opinion on her knee, but that at some point he did make that suggestion to her.

Dr. Doug Brown testified that he is an orthopedic surgeon, and he was accepted by the court as an expert in orthopedic surgery. He testified that he did not believe that Dr. Ballard needed to refer Temple to another orthopedist and was capable of treating her knee by himself. He noted that

6

one of the medical review panelists that did not testify also stated Dr. Ballard was capable of handling all the procedures performed on Temple. He testified that Dr. Ballard met the standard of care in his treatment of Temple and did not cause her injuries.

The jury unanimously determined that Dr. Ballard's care and treatment of Temple did not fall below the standard of care or cause her injury that would not have otherwise occurred. This appeal followed.

**DISCUSSION**

In her brief to this Court, Temple asserted several assignments of error. However, she elected to waive all arguments except her first assignment of error, that the trial court erred in failing to find that she proved the elements of her medical malpractice claim by a preponderance of the evidence, constituting manifest error. Such waiver pretermits consideration of all but one of Temple's assignment of errors, which we will address below.

The manifest error standard applies to the review of medical malpractice cases. Under the manifest error standard of review, a factual finding cannot be set aside unless the appellate court finds that it is manifestly erroneous or clearly wrong. *Benefield v. Sibley*, 43,317 (La. App. 2 Cir. 7/9/08), 988 So. 2d 279, *writs denied*, 08-2210 (La. 11/21/08), 996 So. 2d 1107, 08-2247 (La. 11/21/08), 996 So. 2d 1108. In order to reverse a factfinder's determination, an appellate court must review the record in its entirety and (1) find that a reasonable factual basis does not exist for the finding, and (2) further determine that the record establishes that the factfinder is clearly wrong or manifestly erroneous. The appellate court

must not reweigh the evidence or substitute its own factual findings because it would have decided the case differently. *Benefield*, *supra*. The issue to be decided by the reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one.

Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Where the factfinder's conclusions are based on determinations regarding the credibility of witnesses, the manifest error standard demands great deference to the trier of fact, because only the trier of fact can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. *Id.* Where there is conflicting testimony, reasonable inferences of fact should not be disturbed on review. When the jury's findings of fact are reasonable in light of the entire record, an appellate court may not reverse a choice between two permissible views of the evidence. *Rosell v. ESCO*, 549 So. 2d 840 (La. 1989); *Taylor v. Nexion Health at Pierremont, Inc.*, 54,802 (La. App. 2 Cir. 12/14/22), 353 So. 3d 403, *writs denied*, 23-00057 (La. 3/14/23), 357 So. 3d 823 and 23-00056 (La. 3/14/23), 357 So. 3d 830.

In the present case, Temple narrowed her argument by contending that Dr. Ballard breached the standard of care and caused her injuries by failing to refer her to another orthopedist earlier on during her treatment. There was no specific procedure performed by Dr. Ballard that was asserted to have fallen below the standard of care. Rather, the medical malpractice panel members focused on the number of procedures undertaken before a second

8

opinion was recommended, not how any of the procedures were performed or managed.

A review of the record indicates that the jury heard conflicting testimony from various experts. Dr. Googe very clearly stated that he believed the standard of care required Dr. Ballard to refer Temple to another orthopedist by the third surgery, but he also acknowledged there was no hard and fast rule or any specific guideline for when such a referral is mandated to be invoked. The jury heard that the medical review panel found that Dr. Ballard fell below the standard of care and caused Temple's injuries. However, Dr. Noble, a member of the medical review panel, testified that he would have considered Dr. Ballard's offer for Temple to see another orthopedist as satisfying the standard of care if he had known that such an offer had been made. Dr. Brown testified that Dr. Ballard did not fall below the standard of care, and Dr. Ballard testified that he treated Temple to the best of his ability.

Our review of the record reflects that the jury was presented with the above conflicting testimony regarding the standard of care on whether and when a doctor is required to refer a patient to another doctor. The jury heard the testimony from various experts with differing opinions. We acknowledge it is a statistically rare occasion in which a medical review panel concludes a treating physician's care fell below the applicable standard of care. Likewise, the prospect of nine or ten procedures to address a difficult infection and resulting effects initially gives pause and triggers a commonsense notion that such a course of treatment was not desired and that something likely went wrong in the course of that treatment. However,

there was no testimony that the actual treatment, skill, and efforts undertaken by Dr. Ballard fell below the standard of care. The focus of much of the testimony was about when Dr. Ballard should have recommended a referral, with some suggesting that referral should have occurred significantly earlier in the process of his treatment of Temple. Although we might have evaluated the evidence differently, we cannot find that the jury's decision under these particular facts and with the conflicting testimony of the medical expert witnesses was manifestly erroneous. When presented with differing expert opinions, it is not unreasonable for the jury to have found that Dr. Ballard did not breach the standard of care. Considering this, Temple's assignment of error is without merit.

## CONCLUSION

For the foregoing reasons, we affirm the jury's verdict. Costs of this appeal are assessed to Karen Temple.

**AFFIRMED.**